**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **DORA JEAN MCCORMICK, individually** ) | |
| **and as personal representative of the estate** ) | |
| **of Patrick Kenneth McCormick,** ) | **Civil Action No.** |
| ) | **19-10433-FDS** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SARA C. LISCHYNSKY,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This case involves the alleged theft of assets by a former domestic partner. Patrick McCormick was in a relationship with defendant Sara Lischynsky for several years, during which time he opened a bank account that named her as a joint account holder and designated her as the beneficiary of one of his life-insurance policies. The two broke off their relationship in 2016, and Patrick committed suicide in February 2017. After Patrick's death, Lischynsky received the proceeds from Patrick's life-insurance policy and withdrew all of the money from the bank account.

Plaintiff Dora Jean McCormick, Patrick's mother, was later appointed as personal representative of his estate. She has brought suit against Lischynsky, alleging a variety of tort and contract claims, both personally and on behalf of the estate. Jurisdiction is based on diversity of citizenship.

Defendant has moved for summary judgment. For the following reasons, the motion will

be granted in part and denied in part.

## I.   <u>Background</u>

### A.   <u>Factual Background</u>

The following facts are as set forth in the record and are undisputed except as noted.

Patrick McCormick and Sara Lischynsky were involved in a romantic relationship for some period of time, ending in 2016. (Def. Ex. 1 at ¶ 7; Def. SMF ¶ 2). At some point during that relationship, the two jointly purchased a condominium at 23 Taft Street, Dorchester, Massachusetts. (Def. Answer ¶ 7; Def. Ex. 4 ("Dora Dep.") at 49).

On November 21, 2010, while Patrick and Lischynsky were dating, Patrick opened a Joint Savings Account, Joint Free Checking Account, and Joint Visa Check (debit) card at Digital Federal Credit Union ("DCU"). (Def. Ex. 5).[1] Each account listed Lischynsky as the joint account holder. (Pl. Ex. B ("Lischynsky Dep.") at 46; *see also* Def. Ex. 4 at 54). They were opened in connection with the obtaining of a loan to purchase a jointly-owned car. (Pl. Ex. B at 46).

According to the terms and conditions applicable to all DCU joint accounts:

If there is more than one owner, all agree with each other and with you that all sums now paid in or hereafter paid in by any one or all account owner(s) including all dividends thereon, if any, are and shall be owned by all account owner(s) jointly regardless of their net contributions with a right of survivorship and shall be subject to withdrawal or receipt by any of the account owner(s). Any such payment shall be valid and shall discharge you from any liability. Further, you may mail all Credit Union statements and notices to the Prime Member's last known address and this shall constitute notice to all owners.

(Def. Ex. 8). Lischynsky never made a deposit into the account, or even accessed it, before July 2017. (Def. Ex. 7 ("Lischynsky Dep.") at 112; Pl. Ex. B at 215). Patrick managed his and

---

[1] Because Patrick and his mother share the same last name, this memorandum will refer to them by their first names to avoid confusion.

Lischynsky's shared expenses and so he made the withdrawals and deposits into the account. (Pl. Ex. B at 47).[2]

Patrick also purchased two life-insurance policies with the Massachusetts Mutual Life Insurance Company ("MassMutual").  (Def. Ex. 12).  One policy named his estate as the beneficiary, and the other named Lischynsky.  (*Id.* at 189, 195; Def. Ex. 4 at 84).  The policies state that "[u]nless otherwise requested, all named [b]eneficiaries will be considered primary [b]eneficiaries and proceeds shall be paid equally and in one sum."  (Def. Ex. 12 at 198).  Patrick was also the designated beneficiary of a life-insurance policy purchased by Lischynsky during their relationship but was removed by her upon their breakup.  (Pl. Ex. B at 195).

The relationship between Patrick and Lischynsky ended in February 2016.  (Pl. Ex. B at 73).  On August 24, 2016, the two executed a buy-out agreement in which she sold him her interest in the Dorchester condominium for $40,000.  (Pl. Ex. O).

They also appear to have entered into a further agreement as part of the breakup in September of that year.  (Def. Ex. 7 at 106).  That agreement was, at least in part, recorded in an e-mail exchange.  (Def. Ex. 14).  An e-mail drafted by Patrick stated:

> In exchange for $40,000 to be funded by a refinance of 23 Taft St # 2 in Dorchester, MA, as well as $2,000 to be paid directly from Patrick McCormick and in addition the transfer of joint accounts from Capital One to Sara Lischynsky which have already taken place, it is understood that virtually all financial matters between the two will be considered resolved.  Any property that one may have in hand will be considered their own going forward with only the following exceptions.

(*Id.* at 1).[3]  It then proceeded to list various exceptions. Among other things, it stated that

---

[2] During their relationship, Lischynsky and Patrick each had separate bank accounts as well.  (Pl. Ex. B at 36).

[3] The parties dispute whether the $2,000 mentioned in the agreement refers to a certificate of deposit owned by Lischynsky and Patrick as a joint investment.  Dora contends that the certificate of deposit was part of the separation agreement but was not mentioned in the e-mail exchange, while Lischynsky contends that it was referenced in the agreement.  (*Compare* Pl. Opp. at 10-11, *with* Motion Hearing Transcript at 26).  Lischynsky testified that "[t]he [certificate of deposit] was part of our separation agreement" and that Patrick removed his name

Lischynsky would return any items in her possession that have an emotional attachment for Patrick and would return specific items of his that were at her parents' house.  (*Id.*).  It further stated that:

> Anything already known to be in [Lischynsky's] possession is considered her property once the financial transactions mentioned are completed.  The purpose of this statement is to establish that any day to day items one may currently have that are not of a personal nature is [sic] their own, and any future sale or change in value of that item is not something that the other would be entitled to take part in.

(*Id.*).  The same exception was noted for anything already known to be in Patrick's possession. (*Id.*).

The e-mail also provided that Patrick would continue to pay the full amount of Lischynsky's cellphone bill until the phone contract expired.  (*Id.*).  The e-mail noted that the agreement would not be considered "finalized and done" until "[Lischynsky] has received both the $2,000 direct payment and $40,000 refinance payment, and the joint accounts that have already been received," and further noted that "[o]nly when all of those conditions are met will this be considered resolved."  (*Id.*).

The e-mail concluded with the following:  "[t]he purpose of this statement is to make sure that both Patrick and [Lischynsky] have an equal understand [sic] of what has transpired, and that once the funds have been received by [Lischynsky] both parties will consider all outstanding financial matters completely resolved, but for the exceptions noted above."  (*Id.*).

Lischynsky responded with an e-mail stating, "I am in agreement with the aforementioned proposal in today's email."  (*Id.* at 2).  Neither e-mail specifically referred to the

---

from it, transferring it to her.  (Pl. Ex. B at 50).  She testified that when she cashed it out it was worth about $2,000. (*Id.*).

DCU accounts or either person's life-insurance policies.  (*See* Def. Mem. at 6-7; Pl. Opp. at 6).[4]

Lischynsky informed Dora that she signed Patrick's copy of the agreement and returned it to him, although Dora has been unable to find such a signed copy.  (Def. Ex. 4 at 66, 74-75). There were no further financial discussions or negotiations between Lischynsky and Patrick after September 2016, and no further communication at all after November 3, 2016.  (Pl. Ex. B at 128, 149).

At some point before his death, Lischynsky received the $40,000 and $2,000 payments from Patrick that were specifically mentioned in the e-mail exchange.  (Def. Ex. 7 at 107).

Through his job, Patrick also had a 401(k)-retirement account managed by Fidelity Investments.  (Pl. Ex. G).  His estate was designated as the beneficiary of the account.  (Def. Ex. 4 at 84-85).  On January 23, 2017, Fidelity sent Patrick a confirmation of activity notice, informing him that his account had been updated to allow Fidelity to deposit proceeds from his retirement account into the DCU checking account.  (Pl. Ex. G).  On February 6, 2017, $24,999.47 was transferred into Patrick's DCU checking account from his Fidelity account. (Def. Ex. 6; Def. Ex. 4 at 58).  The parties dispute the reason why Patrick made that transfer. (*Compare* Pl. Opp. at 11, *with* Def. Reply at 2).

At some point between 8:00 p.m. on February 6 and 10:42 a.m. on February 7, 2017, Patrick committed suicide.  (Def. Ex. 3).

Dora was appointed as the personal representative of Patrick's estate.  (Def. Ex. 2).  At some point after Patrick's death, Dora brought the DCU checking account to Lischynsky's attention.  (Def. Ex. 7 at 190).  According to Lischynsky, in order to understand her rights in the

---

[4] Lischynsky testified that she and Patrick did not discuss the DCU accounts, Patrick's life insurance, or his Fidelity 401(k)-retirement account in connection with their breakup.  (Pl. Ex. B at 140).

account, she asked a representative from DCU and a friend who was a lawyer, as well as searched on Google, what "right of survivorship" concerning joint bank accounts meant.  (*Id.* at 190, 194).  On July 3, 2017, she withdrew $24,791.18, the entirety of its contents, from the DCU checking account and closed it.  (Pl. Ex. J; Pl. Ex. B at 161, 173).  She did not inform Dora that she did so.  (Pl. Ex. B at 161).

On July 10, 2017, in response to a letter from MassMutual informing her that she was the beneficiary on one of Patrick's policies, Lischynsky completed the MassMutual Life Insurance Claim Form, and thereafter received the policy's proceeds, which amounted to approximately $25,000.  (*Id.* at 196; Def Ex. 13 at 45-49).  She also did not notify Patrick's estate of her receipt of those proceeds.  (Pl. Ex. B at 196).

On October 3, 2017, Dora sent Lischynsky a letter asking her to send $23,919.47 to Patrick's estate.  (Pl. Ex. K).  That amount represented the $24,999.47 that was transferred into the DCU account from Patrick's 401(k) account, less the amount Patrick had agreed to pay for Lischynsky's cellphone bill pursuant to their separation agreement.  (*Id.*).  Dora's letter stated that the money from the DCU account was Patrick's, pursuant to the separation agreement, and that his father could testify that Patrick transferred the money in anticipation of purchasing land in South Carolina.  (*Id.*).  Lischynsky did not comply.  (Pl. Ex. B at 216).

Dora testified that she has experienced sleeplessness, headaches, loss of concentration, tears, general fatigue, and an inability to concentrate as a result of having to "deal with" Lischynsky after Patrick's death.  (Pl. Ex. E at 87-88, 91).  She testified that "it compounded it more" to have to deal with the fact that Lischynsky received the money that is the subject of this lawsuit.  (*Id.* at 92).  She has self-administered treatment for these symptoms.  (*Id.* at 88).

### B.   Procedural Background

The complaint in this action was filed on June 8, 2018, in Massachusetts Superior Court.

It asserted 15 common-law claims.  However, Lischynsky was not served with the complaint until February 17, 2019.  She then removed the action to this Court on the basis of diversity jurisdiction on March 8, 2019.

Lischynsky moved to dismiss the complaint for failure to state a claim on March 13, 2019.  At the motion hearing on May 15, 2019, Dora's counsel voluntarily dismissed all claims other than Counts 2, 4, 5, 11, and 12.[5]  On July 30, 2019, this Court dismissed the remaining counts other than conversion (Count 4) as to the estate and intentional infliction of emotional distress ("IIED") (Count 11) as to Dora McCormick individually.[6]  Lischynsky has now moved for summary judgment on the remaining counts.

## II.   Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a

---

[5] The complaint does not distinguish whether each claim is alleged by Dora in her individual capacity or as a personal representative of Patrick's estate.  The Court read the complaint broadly to allege that all claims were brought by Dora in both her individual and representative capacities.

[6] The complaint labels Count 4 as "Misappropriation/Conversion/Defalcation."  Because both parties elected to treat this as a claim for conversion, the Court will do the same.

properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.   Local Rule 56.1

As a preliminary matter, at the motion hearing Dora's counsel contended that because Lischynsky's reply memorandum did not respond to the statement of material facts presented in her opposition memorandum, those facts should be deemed admitted.  (Transcript of Motion Hearing at 11-12).

Lischynsky's motion for summary judgment included a statement of undisputed material facts pursuant to Local Rule 56.1.  (*See* Def. Mem. at 2-4).  Dora also attached a statement of material facts to her opposition memorandum pursuant to the same rule, which included factual assertions that differed from those in Lischynsky's statement.  (*See* Pl. SMF).  Lischynsky's reply brief does not explicitly refute those different facts.  (*See generally* Def. Reply). Nonetheless, she was not required to respond to these facts in order to prevent them from being deemed admitted.  Local Rule 56.1 states that "[m]aterial facts of record set forth in the statement required to be served by the *moving party* will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  District of Massachusetts Local Rule 56.1 (emphasis added).  Lischynsky is the moving party for the purposes of the current motion.  Because Dora is not the moving party, Lischynsky did not need to specifically respond to her statement of material facts.  Therefore, those facts will not be deemed admitted.

B.     **Conversion**

Count 4 asserts a claim for conversion.  Under Massachusetts law, a defendant is liable

for conversion if he "intentionally or wrongfully exercise[s] acts of ownership, control or

dominion over personal property to which he has no right of possession at the time."  *In re*

*Brauer*, 452 Mass. 56, 67 (2008) (internal quotation marks, alteration, and citations omitted).[7]

To prove conversion, a plaintiff must further demonstrate that "the defendant either did

some positive wrongful act with the intention to appropriate the property to himself or to deprive

the rightful owner of it, or destroyed the property."  *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st

Cir. 2002).  "It is no defense to conversion for [a] defendant to claim that he acted in good faith,

reasonably believing that he had a legal right to possession of the goods."  *Id.* at 12.  "Moreover,

'[c]onversion does not require an intent to deprive the owner permanently of the property . . . .

Rather, one only need intent to exercise dominion or control over the property of another and can

be held liable for conversion even if the property over which he exercised control was believed

to be his own.'"  *In re Zak*, 573 B.R. 13, 42 (Bankr. D. Mass. 2017) (quoting *In re Sloane*, 2002

WL 1000956, at *6 (Bankr. D.N.H. Mar. 25, 2002)).

Lischynsky has moved for summary judgment on the conversion claim because she

contends there is no evidence that she wrongfully exercised control or dominion over property

---

[7] The First Circuit has articulated the elements of the tort somewhat differently, holding that a plaintiff alleging conversion under Massachusetts law must show the following:

(1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993); *see also Neelon v. Krueger*, 2015 WL 4647931, at *2 n.3 (D. Mass. Aug. 5, 2015) ("In cases where a defendant had legitimate possession of property, for example, a bailee holding goods for a bailor, Massachusetts law recognizes a further element that requires the plaintiff to have requested the property's return and been denied.").

belonging to Patrick's estate.

In order for the Court to determine the interest Patrick's estate had in the funds present in the DCU account and the MassMutual life-insurance proceeds, it must first assess whether the September 2016 e-mail exchange between Patrick and Lischynsky constitutes an enforceable contract.

### 1.      Whether the September 2016 E-Mail Exchange Created an Enforceable Contract

Dora contends that the e-mail exchange represents an enforceable agreement that affected both Patrick's and Lischynsky's rights to various pieces of property.  (*See, e.g.*, Pl. Opp. at 9).  Lischynsky does not seem to dispute that fact.  (*See* Def. Mem. at 6) ("It is undisputed that the email is the best evidence of an agreement between Lischynsky and [Patrick] regarding certain assets.").

"It is well established in Massachusetts that the essential elements of a contract are an offer, acceptance, and an exchange of consideration or meeting of the minds."  *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009) (citing *Northrup v. Brigham*, 63 Mass. App. Ct. 362, 367 (2005)).  While "ordinarily the question of whether a contract has been made is for the jury, . . . where the words and actions that allegedly formed a contract are so clear themselves that reasonable people could not differ over their meaning" a court may decide the issue.  *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 93 (1st Cir. 2002) (internal quotations and alterations omitted).

The September 2016 e-mail exchange constitutes an enforceable contract.  First, Patrick made an offer.  "[A]n offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement."  *Bulldog Invs. Gen. P'ship v. Sec'y of the Commonwealth*, 457 Mass. 210, 220 n.12

(2010) (internal quotation omitted).  Patrick manifested his willingness to enter into an

agreement with Lischynsky that would govern the division of various jointly-owned assets when

he sent her the e-mail proposing such a division and asking her to indicate that she was "okay"

with such a proposal.  (Def. Ex. 14 at 1-2).  Lischynsky then accepted that offer when she wrote:

"I am in agreement with the aforementioned proposal in [the] email."  (*Id.* at 2); *see I&R Mech.,*

*Inc. v. Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 455 (2004) ("Acceptance occurs when the

offeree gives the return requested in the offer.").

Finally, the agreement includes consideration, which is a "bargained-for exchange in

which there is a legal detriment of the promisee or a corresponding benefit to the promisor."

*Durmic v. J.P. Morgan Chase Bank, NA*, 2010 WL 4825632, at *3 (D. Mass. Nov. 24, 2010)

(quoting *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004).  By

entering into the agreement and in exchange for, among other things, $42,000, Lischynsky

agreed to Patrick's condition that "virtually all financial matters between" her and Patrick "will

be considered resolved."  (Def. Ex. 14 at 1).

Moreover, the e-mail exchange represents a "meeting of the minds" between Patrick and

Lischynsky sufficient to create an enforceable agreement.  A "meeting of the minds" occurs

when there is a manifestation of mutual assent to the exchange and consideration.  *O'Rourke v.*

*Jason Inc.*, 978 F. Supp. 41, 45 (D. Mass. 1997).  The fact that an agreement "contains within

itself difficulties of construction about which the parties disagree does not enable a party to

contend that the minds never met."  *Samuels v. Brooks*, 25 Mass. App. Ct. 421, 428 (1988)

(quoting *Bucciero v. Drinkwater*, 13 Mass. App. Ct. 551, 554 (1982)).

Lischynsky testified that the e-mail agreement "was a part of the entire breakup

agreement between" her and Patrick and was part of "dividing up property" between the two.

11

(Pl. Ex. B. at 106; Def. Ex. 7 at 110).  She further testified that the e-mail that Patrick proposed was the "actual agreement" between them and that the e-mail exchange shows "the text of the agreement."  (Def. Ex. 7 at 105; Pl. Ex. B at 104).  That text demonstrates that Patrick and Lischynsky agreed that "virtually all financial matters" between the two of them would be considered resolved and that "[a]ny property that one may have in hand will be considered their own going forward," with some exceptions.  (Def. Ex. 14 at 1).  Thus, the parties manifested mutual assent to separate their property in the way formulated by the agreement.[8]

In summary, the September 2016 e-mail exchange created an enforceable contract between Patrick and Lischynsky.  The question then becomes whether that agreement affected the rights Lischynsky or Patrick's estate may have had in the funds from Patrick's Fidelity 401(k) account or the MassMutual life-insurance proceeds.

For the reasons set forth below, as a result of the September 2016 contract, Patrick retained ownership of both the 401(k) account and the life-insurance policy.  The transfer by Patrick of the funds from the 401(k) account into the DCU account did not convert those funds into jointly-held property, absent any evidence of donative intent; they remained Patrick's property.  Patrick's ownership of the life-insurance policy carried with it the right to change the beneficiary of that policy (and to exclude Lischynsky).  However, he never did so, and therefore Lischynsky is entitled to the policy proceeds.

### 2.    Whether Patrick's Estate Had an Interest in the Funds Present in the DCU Account

Lischynsky contends that she cannot be liable for conversion for retaining the funds in the DCU account because Patrick's estate never had an ownership or possessory interest in those

---

[8] There were also no further negotiations or discussions of financial matters between the two after September 2016.  (Pl. Ex. B at 128, 181).

funds.  (Def. Mem. at 5).  Instead, she contends that she "retained funds maintained in a bank account she jointly owned with [Patrick] that included a right of survivorship."  (Def. Mot. at 1).

### a.  <u>Before the 2016 Agreement</u>

### i.  <u>The DCU Account</u>

Patrick opened the DCU accounts while he and Lischynsky were in a relationship, and each one lists Lischynsky as the joint account holder.  (Def. Ex. 5).  The terms and conditions of DCU joint accounts state that money deposited by an account holder will thereafter be owned by all account owners with a "right of survivorship."  (Def. Ex. 8).  Generally, upon the death of one tenant, property held in a joint tenancy with a right of survivorship becomes the sole property of the surviving joint tenant.  *See Finn v. Finn*, 348 Mass. 443, 446-47 (1965).

Dora contends that Patrick opened the joint accounts without any donative intent toward Lischynsky and only as a "matter of convenience."  (Pl. Opp. at 6).  Thus, she alleges that Lischynsky never had an interest in the account, and therefore that when Patrick died the estate was the only party with a right to the remaining account funds.  (*Id.*).  But the only evidence in the record as to the reason for the accounts' creation is Lischynsky's testimony that they were opened in connection with a car loan she and Patrick received as part of purchasing a jointly-owned car.  (*See* Pl. Ex. B at 46).  Moreover, the cases Dora cites concerning the importance of a joint account owner's donative intent describe situations in which a person *added* someone else as a joint account owner to an already-existing account.  *See, e.g.*, *Coolidge v. Brown*, 286 Mass. 504, 506 (1934); *In re Estate of Zanconato*, 98 Mass. App. Ct. 1108, 1108 (2020).  Here, the account was opened in both Patrick's and Lischynsky's names.

"It is settled that the transaction of creating a joint bank account with the right of survivorship must be taken at face value unless evidence shows that the parties did not so intend."  *Desrosiers v. Germain*, 12 Mass. App. Ct. 852, 855 (1981) (citing *DePasqua v.*

*Bergstedt*, 355 Mass. 734, 736 (1969)).  There is no evidence that Patrick created the account for any "convenience" purpose other than for the jointly-held car loan for his and Lischynsky's jointly-held car.  The fact that Lischynsky never personally deposited or withdrew funds from the account does not change that fact:  she testified that Patrick managed their shared expenses and therefore presumably he made the withdrawals and deposits into the account that were related to their jointly-held car loan.  (Def. Ex. 7 at 112; Pl. Ex. B. at 47).

Thus, under the terms of the accounts' contracts and uncontroverted by any evidence surrounding their creation, the DCU accounts include a right of survivorship.

### ii.      Patrick's Fidelity 401(k) Account

Patrick had a 401(k)-retirement account administered by Fidelity.  (Def. Ex. 4 at 46). Patrick named his estate as the beneficiary of that account.  (*Id.* at 84-85).  Thus, upon Patrick's death his estate was entitled to the proceeds from that 401(k) account.

### b.      After the 2016 Agreement

Lischynsky contends that the 2016 agreement had no effect on her ownership interest in the DCU account and that any funds present, regardless of their source, were rightfully hers upon Patrick's death.  (Def. Mem. at 6-7).  Dora, conversely, contends that by entering into the agreement Lischynsky either waived her right to the proceeds or modified the DCU account contract so that she no longer had a right to the account's contents.  (Pl. Opp. at 8-9).

"Contract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court . . . ."  *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004).  In interpreting a contract, a court seeks to give "effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible."  *Shea v. Bay State Gas Co.*, 383 Mass. 218, 224-25 (1981).  In addition, a court "construe[s] a contract as a whole, so as to give reasonable effect to each of its provisions."  *James B. Nutter & Co. v. Est. of Murphy*, 478 Mass.

14

664, 669 (2018) (internal quotation omitted).  If the contract is unambiguous, the question of

interpreting it is an issue of law for the court.  *Nadherny*, 390 F.3d at 48.  A court must interpret

it in accordance with its ordinary and plain meaning.  *See Balles v. Babcock Power Inc.*, 476

Mass. 565, 571 (2017).  Furthermore, an agreement is not ambiguous merely because "a

controversy exists between the parties, each favoring an interpretation contrary to the other," or

because a word has multiple dictionary definitions.  *Citation Ins. Co. v. Gomez*, 426 Mass. 379,

381 (1998) (internal quotation omitted).  Rather, a contract provision is ambiguous "only if it is

susceptible of more than one meaning and reasonably intelligent persons would differ as to

which meaning is the proper one."  *Id.*  The determination as to whether a contract term is

ambiguous is also a question of law for the court.  *Bank v. Thermo Elemental Inc.*, 451 Mass.

638, 648 (2008).  In making that determination, courts must first look to the language of the

agreement without regard to extrinsic evidence.  *See President & Fellows of Harvard Coll. v.*

*PECO Energy Co.*, 57 Mass. App. Ct. 888, 896 (2003).[9]

The Court thus begins with the language of the e-mail.  The agreement states that after

Lischynsky receives the $42,000 from Patrick, "virtually all financial matters between the two

will be considered resolved" and that "both parties will consider all outstanding financial matters

completely resolved, but for the exceptions noted" in the e-mail.  (Def. Ex. 14 at 1).  The

agreement refers to the transfer of the Dorchester condominium, but specifically names few other

assets.  (*Id.*).  In particular, it notes that Patrick requested that Lischynsky return a mountain

bike, a bread maker, and a record player.  (*Id.*).  It does not specifically mention the DCU

---

[9] If the contract language is ambiguous, the court can also then look to extrinsic evidence "in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract."  *Samia Cos. LLC v. MRI Software LLC*, 898 F. Supp. 2d 326, 336 (D. Mass. 2012) (quoting *PECO Energy Co.*, 57 Mass. App. Ct. at 896).  However, even where extrinsic evidence has been admitted, the focus remains on the parties' probable intent, informed by "justice and common sense."  *Affiliated FM Ins. Co. v. Const. Reinsurance Corp.*, 416 Mass. 839, 846 (1994).  "[T]he words themselves remain the most important evidence of intention."  *Id.* at 845-46.

account or Patrick's 401(k) account.  In addition, the agreement states that items "considered to

have an emotional attachment" for Lischynsky "that [are] not already known to be in [Patrick's]

possession" will be offered to be returned, but that "[a]nything already known to be in [Patrick's]

possession is considered his property once both of the financial transactions mentioned are

completed."  (*Id.*).  It further states that "[t]he purpose of this statement is to establish that any

day to day items one may currently have that are not of a personal nature [are] their own, and any

future sale or change in value of that item is not something that the other would be entitled to

take part in."  (*Id.*).

It is clear from the language of the agreement that Patrick and Lischynsky intended to

separate their financial affairs.  *See Shea*, 383 Mass. at 222 (noting that a contract is to be

construed in order to "ascertain the intention of the parties and to effectuate the purpose sought

to be accomplished") (internal quotation omitted).  The agreement twice states that "financial

matters" between the two of them will be "resolved" after Patrick paid $42,000 to Lischynsky.

(Def. Ex. 14 at 1).[10]  It also notes that any "property that one may have in hand will be

considered their own going forward," and that any "future sale or change in value of [one's]

item" is for that individual's benefit alone.  (*Id.*).

A reasonable person would not interpret a 401(k) account to be anything other than a

"financial matter."  *See Citation Ins. Co.*, 426 Mass. at 381.  Moreover, Lischynsky testified that

her and Patrick's "finances were separate, which means [their] 401(k)s were separate."  (Pl. Ex.

B at 117).  She further stated:  "[t]his is an [a]greement about our shared property . . . . [O]ur

separate 401(k)s are not shared property."  (*Id.*).  Thus, at the time Patrick and Lischynsky

executed the 2016 agreement and Patrick transferred the $42,000 to Lischynsky, both parties had

---

[10] It is undisputed that Lischynsky did receive the $42,000 from Patrick.  (Def. Ex. 7 at 107).

an interest in their own respective 401(k) accounts but not those of the other person.  The record

contains no evidence of any event that occurred after the 2016 agreement to change that fact.  As

Lischynsky testified, the two did not engage in any further financial discussions or negotiations

after September 2016.  (*Id.* at 128).  Upon Patrick's death, therefore, Patrick's estate, as the

beneficiary of the 401(k) account, had an interest in the account's funds.

Patrick's act of transferring a portion of those funds into the DCU account immediately

prior to his death did not automatically alter the nature of that property.  If Patrick had

transferred money from his 401(k) account into the DCU account for one day and then

transferred it back out, the money would not cease to be his.  The fact that Patrick died

immediately after the funds were deposited into the DCU account should not alter the analysis, at

least absent some evidence that he intended to give Lischynsky the rights to the money.

Patrick and Lischynsky had settled their financial affairs—and claimed a sole interest in

their respective 401(k) accounts—five months prior to the transfer.  There is no evidence in the

record that Patrick intended to transfer the money into the DCU account as some kind of gift to

Lischynsky.  Why he initiated the transfer of funds is not apparent from the record.  Dora

contends that "Patrick deposited the fund[s] into his DCU account in order to purchase land and

build a house in South Carolina."  (Pl. Opp. at 11).  But in Dora's deposition, to which she cites

in support of that contention, she never makes that assertion.  (*See generally* Pl. Ex. E).  Dora

also submitted as an exhibit an e-mail from Patrick's current girlfriend at the time of his death in

which the girlfriend states:  "[f]rom what Patrick had told me, he intended to use his 401(k) to

purchase materials needed to build himself a small house . . . but I wasn't aware that he had

withdrawn anything from it."  (Pl. Ex. M).  At the motion hearing, Dora's counsel stated that the

girlfriend, as well as Patrick's father, could testify at trial about the reason that Patrick

transferred the money.  (Motion Hearing Transcript at 12-13).  Conversely, Lischynsky contends that there is no admissible evidence of Patrick moving the money for the purpose of building a house in South Carolina.  (Def. Reply at 2).[11]  In any event, the Court must construe all reasonable inferences in favor of the non-moving party.  It thus cannot interpret Patrick's act of transferring the 401(k) account funds into the DCU account, without more, as evidence of an intent to grant Lischynsky a joint interest in that property.  And the fact that the DCU account was a joint account with the right of survivorship is not sufficient evidence to establish that intent.

In any event, it is sufficient for present purposes to deny Lischynsky's motion for summary judgment.  Lischynsky has not demonstrated that Patrick's estate had *no* interest in the money transferred from Patrick's 401(k) account into the DCU account.  Thus, the Court cannot find that, as a matter of law, the estate cannot maintain a conversion claim against Lischynsky.  Accordingly, Lischynsky's motion for summary judgment will be denied on Count Four to the extent that it relates to the DCU account funds.

### 3.     Whether Patrick's Estate had an Interest in the MassMutual Life-Insurance Proceeds

Lischynsky also contends that she cannot be liable for conversion for retaining the proceeds from Patrick's MassMutual life-insurance policy because his estate never had an ownership or possessory interest in those proceeds.  (Def. Mem. at 6).  She alleges that as the

---

[11] At the motion hearing, Lischynsky's counsel contended that Patrick's girlfriend had not been identified in initial disclosures or in the discovery phase of the case.  (Motion Hearing Transcript at 25).  Lischynsky did testify, in response to the question "[a]nd were you made aware after his death that Patrick wanted to use the 401(k) money he pulled out of the Fidelity account to purchase the home?" "I was made aware of that after his death," but later stated that she had no information about that other than what she had discussed with her lawyer.  (Pl. Ex. B at 142, 148-49).

named beneficiary of the account, she became the lawful owner of the proceeds at the moment Patrick made her the beneficiary. (*Id.*).

### a.   Before the 2016 Agreement

At some point prior to his death, Patrick named Lischynsky as the beneficiary of one of his MassMutual life-insurance policies. (Def. Ex. 12 at 195). "The rights of the beneficiary attach at once upon becoming as designated by the terms of the [life-insurance] contract." *Tyler v. Treasurer & Receiver Gen.*, 226 Mass. 306, 308 (1917). The fact that life-insurance beneficiary designations can be changed does not affect those rights. *Id.* at 309. Accordingly, Patrick "retain[ed] no ownership" of the proceeds that "passed to [Lischynsky]" under the life-insurance contract. *Id.* Thus, without any consideration of the 2016 agreement, Patrick's estate had no ownership interest in the life-insurance proceeds that Lischynsky received from MassMutual upon Patrick's death.

### b.   After the 2016 Agreement

Dora contends that Lischynsky waived her right to the life-insurance proceeds by entering into the September 2016 agreement with Patrick. (Pl. Opp. at 12).

Lischynsky, as the beneficiary named on the life-insurance contract entered into between Patrick and MassMutual, was an intended third-party beneficiary. *See* Restatement (Second) of Contracts § 302 cmt. c, illus. 1; *South Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F. Supp. 3d 197, 234 (D. Mass. 2016) ("Massachusetts follows section 302 of Restatement (Second) of Contracts (1981) in ascertaining whether a person is an intended or incidental beneficiary."). A third-party beneficiary can enter into agreements with one of the parties to the original contract to either waive their right to the benefit to which they are entitled under the original contract or to ensure that the benefit will not be revoked. *See, e.g.*, *Life Ins. Co. of North Am. v. Reinheimer*, 497 F. Supp. 2d 254, 256-57 (D. Mass. 2007); *Foster v. Hurley*,

444 Mass. 157, 163-64 (2005) ("Although by the terms of the policy [the policy holder] had the right as between himself and the insurance company to change the beneficiary, he could contract with the plaintiff not to do so and would then no longer have that right as between himself and the plaintiff.") (quoting *Mass. Linotyping Corp. v. Fielding*, 312 Mass. 147, 149 (1942)); *Culwick v. Wood*, 384 F. Supp. 3d 328, 345-46 (E.D.N.Y. 2019); *see also* Restatement (Second) of Contracts § 306 cmt. b (noting that a beneficiary is entitled to disclaim a promised benefit).

Waiver is "the voluntary relinquishment of a known right." *Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 372 (D. Mass. 1991) (citing *St. John Bros. Co. v. Falkson*, 237 Mass. 399, 402 (1921)). "A waiver can be express, or it can be inferred from a party's conduct and the surrounding circumstances." *Bos. Helicopter Charter, Inc.*, 767 F. Supp. at 372. Proof of a waiver "must be shown clearly, unmistakably, and unequivocally." *Psychemedics Corp. v. City of Boston*, 486 Mass. 724, 745 (2021) (internal quotation omitted). An implied waiver by conduct "must be unequivocal and must allow room for no other explanation of the conduct of the person who allegedly is waiving a contractual right." *Bos. Helicopter Charter, Inc.*, 767 F. Supp. at 372.

Dora contends that Lischynsky waived her right to the life-insurance proceeds by entering into the 2016 agreement with Patrick. (Pl. Opp. at 12-14). The Court must therefore determine whether any portion of the September 2016 agreement could be interpreted to encompass the MassMutual life-insurance proceeds and thus affect Lischynsky's right to those proceeds. As before, the Court begins with the language of the agreement.

A reasonable person would not interpret the agreement to alter Lischynsky's right to Patrick's MassMutual life-insurance policy proceeds. The agreement states that "[a]nything already known to be in [Patrick's] possession is considered his property" and that "any day to

day items [Patrick] may currently have that are not of a personal nature [are] [his] own."  (Def. Ex. 14 at 1).  A reasonable person could not interpret life-insurance proceeds to be considered in the "possession" of the insured while he is still alive, nor could they be considered "day to day items."

The agreement also states that "[a]ny property that one may have in hand will be considered their own going forward."  (*Id.*).  Patrick therefore retained an ownership interest in the life-insurance policy after the contract was formed in September 2016.  From that point forward, he had the right as owner to change the beneficiaries if he chose.  But the life-insurance *proceeds* were not property that he had "in hand."  Moreover, the rights to the proceeds vested in the beneficiary "when the designation is made in accordance with the terms of the contract of insurance," and the "[t]he insured retains no ownership of that which has passed to the beneficiary under the contract."  *Tyler*, 226 Mass. at 308-09.  Patrick designated Lischynsky to be the beneficiary of his life-insurance policy before the September 2016 agreement.  Thus, at the time of the agreement *Lischynsky*, not Patrick, had conditional rights in the insurance proceeds.  Again, Patrick was free to change the beneficiary designation at any point prior to his death, which would divest Lischynsky of any rights to the proceeds.  *See Foster*, 444 Mass. at 166 ("[A] beneficiary's legal interest in policies or plans is conditional and subject to defeasance until the insured's death . . . .") (citing *Gleed v. Noon*, 415 Mass. 498, 500 (1993)).  And so, at the time of the agreement Patrick owned the right to change the beneficiary on the policy, and Lischynsky owned the right to be the beneficiary, subject to Patrick's right to change it.  Because the agreement did not alter the parties' positions and Patrick never exercised his right, upon Patrick's death Lischynsky's right as the beneficiary to the policy's proceeds remained.

Dora contends that the agreement demonstrates that Patrick "forgot" Lischynsky was a named beneficiary on the MassMutual life-insurance policy, and so the "removal of [Lischynsky] as a beneficiary from [Patrick's] insurance policy was an oversight by Patrick during the negotiation of the [a]greement." (Pl. Opp. at 13). But the agreement does not include language that could reasonably be interpreted to capture a life-insurance policy owned by only one party that names the other party as a beneficiary. The Court seeks to give "effect to the parties' intentions" when interpreting a contract, *Shea*, 383 Mass. at 224-25, but the words of the agreement "themselves remain the most important evidence of intention," *Affiliated FM Ins. Co.*, 416 Mass. at 845-46. The Court may not read into an agreement terms that are not reasonably encompassed by the language of the agreement itself. The e-mail exchange thus did not affect the life-insurance policy.

Finally, Dora contends that the extrinsic evidence shows that Lischynsky waived her right to the proceeds. In particular, she alleges that the fact that Lischynsky removed Patrick from *her* life-insurance policy evidences Lischynsky's understanding that the agreement meant that each party had no interest in the other's insurance-policy proceeds. (Pl. Opp. at 13). But Patrick had the same right to remove her from his policy. After the agreement, she owned her policy, and he owned his. The fact that he failed to exercise his ownership rights to change the beneficiary does not affect the analysis.

In summary, Patrick kept his ownership of the life-insurance policy after the 2016 agreement. Patrick could have changed the beneficiary, but did not. Lischynsky did not waive her right to those proceeds. Therefore, upon Patrick's death, the proceeds passed to Lischynsky. His estate cannot claim an ownership interest in them, and therefore the conversion claim against

Lischynsky must fail.  Accordingly, Lischynsky's motion for summary judgment will be granted

on Count Four to the extent that it relates to the MassMutual life-insurance policy proceeds.

### C.     Intentional Infliction of Emotional Distress

Count 11 asserts a claim for intentional infliction of emotional distress.  To succeed on a

claim for IIED under Massachusetts law, a plaintiff must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of his conduct; (2) that
> the conduct was extreme and outrageous, was beyond all possible bounds of
> decency[,] and was utterly intolerable in a civilized community; (3) that the
> actions of the defendant were the cause of the plaintiff's distress; and (4) that the
> emotional distress sustained by the plaintiff was severe and of a nature that no
> reasonable [person] could be expected to endure it.

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976) (internal quotation marks and

citations omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995).

Courts apply a "very high" standard to IIED claims, especially as to the nature of the

conduct.  *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996).  Conduct is "'extreme

and outrageous' only if it is 'so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community.'"  *Lozano v. Suffolk Superior Ct.*, 2015 WL 5684071, at *4 (D. Mass.

Sept. 28, 2015) (quoting *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987)).  Recovery for an

IIED claim generally "requires more than 'that the defendant has acted with an intent which is

tortious or even criminal, or that he has intended to inflict emotional distress, or even that his

conduct has been characterized by "malice" or a degree of aggravation which would entitle the

plaintiff to punitive damages for another tort.'"  *Doyle*, 103 F.3d at 195 (quoting *Foley*, 400

Mass. at 99).  "[L]iability cannot be predicated upon 'mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities . . . .'"  *Foley*, 400 Mass. at 99 (quoting

Restatement (Second) of Torts § 46 cmt. d (1965)).  IIED requires "a high order of reckless

23

ruthlessness or deliberate malevolence that . . . is simply intolerable." *Morse v. Commonwealth of Mass. Exec. Off. of Pub. Safety Dep't of State Police*, 123 F. Supp. 179, 196 (D. Mass. 2015) (quoting *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8 (1994)).

A reasonable jury could not find that Lischynsky engaged in any intentional acts sufficiently extreme and outrageous to meet the high standard for IIED claims.  MassMutual contacted Lischynsky about the insurance proceeds because Patrick's policy listed her as the beneficiary.  (Pl. Ex. B at 195-96; Def. Ex. 12 at 195).  It was not "atrocious" for her to accept those proceeds as the designated beneficiary.  Dora contends that because Lischynsky and Patrick entered into the September 2016 separation agreement it was outrageous for her to accept the money.  But as described above, that agreement did not change Lischynsky's right to the insurance proceeds.  And even if it did, it was not patently obvious that it did so, and thus Lischynsky could have reasonably believed that she was entitled to the proceeds and it was therefore not outrageous for her to accept them.

Similarly, Lischynsky's conduct with respect to the DCU account was also not sufficiently extreme or outrageous to rise to the level required under an IIED claim.  Lischynsky took reasonable steps after being reminded of the existence of the DCU account to educate herself on her right to the remaining balance.  She did her own research on Google and also spoke with a friend who was a lawyer, as well as someone from DCU itself, as to what "right of survivorship" concerning joint bank accounts meant.  (Def. Ex. 7 at 190, 194); *see also* (Pl. Ex. B at 117) ("My understanding of what [the DCU terms] means . . . is that the account holder who survived the other one, it becomes their property in full.").  It was reasonable for her to then believe she owned the money in the account.  Even if she ultimately is not entitled to the money that was transferred from Patrick's 401(k) account immediately prior to his death, the bar for

asserting an IIED claim is considerably higher than a reasonable or even unreasonable mistake. Lischynsky researched her rights, believed she was entitled to the funds, and therefore kept them, which does not constitute "profoundly shocking conduct" necessary to sustain an IIED claim. *Conway*, 37 Mass. App. Ct. at 8.

The fact that Lischynsky did not inform Dora that she removed the money from the DCU account or that she had received the insurance proceeds does not transform her conduct into that which is "atrocious" and "utterly intolerable in a civilized community." *Lozano*, 2015 WL 5684071, at *4; (*see* Pl. Ex. B at 196). Lischynsky believed she was the rightful owner of the funds—it was thus understandable why she did not feel obligated to report the receipt of them to Dora. A reasonable jury, even putting "as harsh a face" on her actions as "the basic facts would reasonably allow," *Richey v. Am. Auto. Ass'n, Inc.*, 380 Mass. 835, 839 (1980), could not find that this omission was the sort of targeted, deliberate, and malicious conduct that is required for an IIED claim. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 617 (D. Mass. 2016).

Accordingly, Lischynsky's motion for summary judgment as to Count 11 will be granted.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is DENIED as to Count 4 to the extent it asserts a claim for conversion based on the DCU account, and otherwise GRANTED; and GRANTED as to Count 11.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  May 14, 2021                    Chief Judge, United States District Court